IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

PERCELL L. ROSS,            )
          Plaintiff,        )
                            )        Civil Action No. 7:20-cv-000774
v.                          )
                            )        By: Elizabeth K. Dillon
SUPERINTENDENT BOBBY        )            United States District Judge
RUSSELL, *et al.*,          )
          Defendants.       )

## MEMORANDUM OPINION

Plaintiff Percell L. Ross, a former Virginia inmate proceeding *pro se*, filed this 42 U.S.C. § 1983 complaint, in which he sues fourteen defendants, including two Doe defendants. He asserts claims arising from his incarceration at the Western Virginia Regional Jail ("the Jail") in the second half of 2020. In general terms, he claims that the Jail's policies and procedures for dealing with COVID-19 were inadequate and constituted deliberate indifference toward the risk of his contracting the disease. He challenges the conditions of his confinement—both before he got ill and afterward—as violating his Eighth Amendment rights. And he asserts a claim based on an alleged denial of access to the Jail's grievance procedure.

Pending before the court are two motions to dismiss, both of which are fully briefed and ripe for disposition. The first was filed by defendants Wellpath, LLC and David MacDonald, MD (collectively "the Medical Defendants") (Dkt. No. 53). The second was filed by the remaining named defendants (collectively "the Correctional Defendants"): Superintendent Bobby Russell, Major Christopher Hayes, Captain Chad Keller, Captain Scott Booher, Grievance Officer Lyle Helmick, Officer William Maddy, Officer Alec Brown, Officer Jason Bevil, Officer Blake Sawyer, and Sergeant Rachel Robertson. (Dkt. No. 74). The only other two defendants are two Doe defendants, who Ross recently identified based on documents supplied by the Medical Defendants.

As discussed in more detail herein, the court will allow Ross to substitute those two individuals for the Doe defendants, but will dismiss the claims against them for failure to state a claim, pursuant to 28 U.S.C. § 1915A(b)(1).  Additionally, the court will grant both motions to dismiss.

## I.   BACKGROUND

### A.  Summary of Basic Allegations and Documents Considered

Ross's lengthy amended complaint refers to a number of incidents that involved inmates other than him, is repetitive in places, and includes many statements or conclusions that are not factual allegations or are unsupported by any facts.[1]  The court sets forth below his factual allegations, attempting to consolidate his repetitive allegations.  Overall, Ross is complaining that defendants—both supervisory defendants through their decisions and policies and some lower-ranking officers through specific actions—took steps that increased the possibility that he and other inmates would contract COVID-19, thereby showing deliberate indifference to the serious risk that the illness posed.  This includes mistakenly keeping him in a unit with inmates who had tested positive, including giving him a cellmate who had a positive test result, when Ross had tested negative.

After Ross tested positive for COVID-19, he alleges that he experienced severe symptoms, although he does not allege that he ever reported those symptoms to anyone, a fact confirmed by his medical records.  He also contends he received inadequate treatment, and he challenges the conditions in the cell where he spent part of his time recovering.  The court discusses his allegations in more detail below.

Before turning to his specific allegations, though, the court must determine which

---

[1]  Where Ross has failed to support conclusory statements with any facts, the court does not discuss them. These include, for example, an assertion that defendants failed to train and supervise their employees regarding the pandemic.

documents it can consider in ruling on the motions.  Generally, when a defendant moves to

dismiss a complaint under Rule 12(b)(6), the court is limited to considering the sufficiency of the

allegations set forth in the complaint and the 'documents attached or incorporated into the

complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).[2]

District courts have discretion "to determine whether or not to 'exclude' matters outside the

pleadings."  *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 996

(4th Cir. 1997).  Usually, when "matters outside the pleadings are presented to and not excluded

by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R.

Civ. P. 12(d); *Zak*, 780 F.3d at 606.  The court may, however, consider a document attached to a

motion to dismiss if it is integral to the complaint and there is no dispute about the document's

authenticity.  *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

Here, Ross attached many documents to his amended complaint.  Among other

documents, he provides a portion of the Jail's Standard Operating Procedure 2.30A, which has as

its subject "Pandemic Virus Policy," and one page of a "Jail Inspection Report" from June 2020.

He also has presented affidavits from two inmates (Justin Hampton and Curtis Sparks), grievance

documents submitted by Hampton and four other inmates, and two health request forms

submitted by one of the four, Tony Anders.  (*See generally* Dkt. No. 41-2 (exhibits to amended

complaint).)

In their responses, defendants provide the *complete* copies of some of the documents

Ross attached to his complaint.  Specifically, they include the Jail's pandemic policies in effect

at the time of these events and the complete June 2020 Jail Inspection Report by the Virginia

Department of Corrections ("VDOC").  (Dkt. No. 29-2.)  The court considers these documents,

---

[2] The court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

as well.

Additionally, defendants have submitted a copy of Ross's medical records, which include copies of his COVID-19 test results.  (Dkt. Nos. 53-1 and 53-2; *see also* Dkt. No. 29-1 (copy of medical records).)  Defendants assert that the court may consider them in ruling on the motion to dismiss, (Corr. Defs.' Mem. Supp. Mot. Summ. J. 4–5, Dkt. No. 75), and Ross has not challenged that assertion or the authenticity of the records.  Nonetheless, although the complaint references Ross's medical care and his COVID-19 tests, the court does not believe those documents are "integral to the complaint."  Instead, they fall more in the category of documents that may constitute relevant evidence but have "no independent legal significance" to Ross's claims.  *Goines*, 822 F.3d at 166; *see also Williams v. Trent*, No. 7:16cv00480, 2017 WL 4158660, at *2 n.3 (W.D. Va. Sept. 19, 2017) (finding it "premature" to consider the plaintiff's medical records at the motion-to-dismiss stage, but also noting that defendants did not rely on the documents to support their grounds for dismissal).  Thus, the court will not consider the medical records in ruling on the two pending motions.  Likewise, the court does not consider the additional information submitted by Ross in his responses.

**B.  Specific Allegations of the Amended Complaint**

### 1.  Ross Arrives at Jail and, Months Later, Inmates and Staff Begin Getting Sick in Large Numbers

Ross was transferred to the Jail on August 19, 2020.  Upon his arrival, he was placed in segregation on quarantine status.  While in segregation, he was allowed to use and share the telephone, tablets, and kiosk with other inmates in the unit.  He was not given hand sanitizer or cleaning materials to disinfect shared items.  He was given a COVID-19 test "at some point," which came back negative.  At that point, he was moved to general population.  (Am. Compl. ¶¶ 5–9, Dkt. No. 41-1.)

While in segregation, Ross was taken to the medical department for breathing treatments

4

due to his chronic asthma and high blood pressure.  During one such treatment, an unidentified nurse told him that he would feel and breathe better once he was moved from the segregation cells because the segregation cells are "dangerous" and "rarely get cleaned."  (*Id.* ¶ 11.)

In late September or early October 2020, defendants Russell, Hayes, Keller, and Booker adopted either a policy or practice of renting bed space at the Jail to inmates from the Franklin County Jail "who they had known to be positive and contagious for the COVID-19 virus."  (*Id.* ¶ 12.)  He claims that the Jail was operating over capacity and had no beds or bunks for these inmates, and so inmates had to sleep on the floor in general population cells and the gym. Although he points to instances when he and other incoming inmates were quarantined, he alleges that the incoming Franklin County inmates were not quarantined from the rest of the inmate population. (*Id.* ¶¶ 12–15.)

Thereafter, a number of staff and inmates got sick, which Ross attributes to the facility being not just "overcrowded" but also "unmanageable and unsafe."  (*Id.* ¶ 18.)  He alleges that staff and inmates were not provided with adequate "safety precautions, procedures, and personal protection equipment" that defendants knew were necessary to prevent the spread of COVID-19. (*Id.* ¶ 17.)

Ross specifically alleges that Keller and Rachel Robertson[3] assigned inmates who were known to have been positive for COVID-19 to live in general population units, and that Russell, Keller, Robertson, and Hayes moved inmates with COVID-19 to cells with other inmates "who had not previously been exposed."  (*Id.* ¶ 21.)  He gives specific examples of such cell assignments, which he appears to base on grievances submitted by other inmates.  Ross further claims that all of the contagious inmates were allowed to share items such as tablets, telephones,

---

[3] References in the amended complaint to "Sergeant Jane Doe" are to defendant Robertson, who was identified and substituted as a defendant. (Dkt. No. 59.)

and newspapers with the general population without cleaning in between uses.  (*Id.* ¶ 24.)

Certain housing units were placed on quarantine status, but were not kept strictly quarantined.  Instead, inmates were "still shuffled in and out of these units" at the direction of Defendants Keller, Booher, and Robertson.  (*Id.* ¶ 35.)  He states that some of the units on quarantine status became over-populated, which resulted in the shuffling of more sick, contagious inmates "back and forth."  All of this "shuffling" violated the "Pandemic Virus Policy."  (*Id.* ¶¶ 61–62.)

Ross alleges that some of the defendants said or did things that he interpreted as "as if the officers were trying to intentionally allow the virus to spread."  (*Id.* ¶ 52.)  For example, defendant Sawyer entered a quarantined unit through a door that led to another unit, which allowed "contaminates" to enter from one unit into another.  (*Id.* ¶¶ 36–37.)  This was a violation of policy.  (*Id.* ¶ 38.)  When Ross questioned Sawyer about using the door, he responded, "It don't matter; we're all gonna get the shit, anyway."  (*Id.* ¶ 37.)  Defendant Maddy also opened or left open a sliding door between units for about fifteen minutes on November 11, 2020, at approximately 7:20 p.m.  This permitted inmates from two separate units to congregate and have personal contact.  The same day, another inmate "had passed out and [become] unresponsive" from COVID-19 symptoms.  (*Id.* ¶¶ 47–48.)  Defendant Maddy told Ross that the officers "didn't give a shit what happens" because inmates could file lawsuits but the officers were told they could not, and other officers shared this attitude.  (*Id.* ¶¶ 50–51.)

Also, on an unspecified date, Ross asked Sawyer if he could get a mask from the medical department because Ross did not think the vinyl cloth mask he had been issued was working. Defendant Sawyer told Ross that he (Sawyer) could not get proper personal protection equipment from "them," so no.  Based on this statement, Ross alleges that Superintendent Russell did not equip staff with appropriate "PPE other than masks and gloves until after

November 7, 2020." (*Id.* ¶¶ 40–41.)  Officers at the Jail, including some of the defendants, "were openly upset and complaining that they were 'getting sick from inmates and bringing it home to their [families].'" (*Id.* ¶ 49.)  At some point later, and after many inmates had contracted the virus, inmates were issued KN95 masks.  (*Id.* ¶ 43.)

Staff members also got sick, and some unidentified staff members came to work and had contact with inmates although they had tested positive.  For example, defendant Brown came to work on an unknown date while he was contagious with COVID-19 and "purposefully enter[ed] the E-4 housing unit without a mask" and spoke with inmates.  (*Id.* ¶ 46.)  This occurred after the arrival of the Franklin County inmates.  Before that time, only one officer had contracted COVID-19.  (*Id.* ¶¶ 44–45.)

Ross wrote and "sent yellow request slips" to Russell and Hayes complaining about the unsafe living conditions and requesting to be sent to a different jail, but defendants either failed to respond at all or had someone else answer the complaints.  (*Id.* ¶¶ 25–26.)

### 2.  Complaints About Medical Treatment and Practices

Ross claims that as the number of COVID-19-positive inmates rose, defendants Wellpath, its director Dr. MacDonald, "and their staff" adopted a practice of treating complaints of COVID-19 symptoms as "routine," rather than an emergency, causing Ross to "suffer unnecessarily" due to delays in medical treatment.  (*Id.* ¶¶ 27–28.)  He appears to base this on several exhibits in which a medical staff member had responded to the complaints of another inmate, Anders, by examining the inmate and then checking a box stating "routine," as opposed to "urgent" or "emergency."  (Dkt. No. 41-2, at 8–9.)

Ross also claims that "defendants and their contractors," an apparent reference to medical personnel, breached their duty to "keep and maintain accurate records."  (Am. Compl. ¶ 32.)  In particular, he says that they "falsified" COVID-19 test results.  For support of this allegation,

Ross points to affidavits from inmates attached to his complaint.  One, from inmate Hampton, avers that Hampton was not tested, but the medical department at the Jail reported him as having been tested.  Other affidavits from other inmates complained that they "were not being properly tested and [were] being placed in general housing."  (*Id.* ¶¶ 33, 106–07.)  He also claims that defendant Russell failed to investigate Hampton's allegation of this "intentional false reporting" of COVID-19 test results.  (*Id.* ¶¶ 103–06.)

### 3.  Ross Tests Negative, But Is Mistakenly Left in Unit with Positive Inmates and Becomes Ill

On November 12, 2020, Ross and all other inmates in the 4-E housing unit were given COVID-19 tests.  The next day, defendants Keller and Booher, along with additional officers, began moving inmates out of the unit.  When all inmates were moved, Keller and Booher went door-to-door informing the remaining inmates that they had tested positive for COVID-19.  This included Ross.  Booher also told Ross that the medical department would be around to see and assess everyone.  Ross was in a cell by himself and felt fine.  After two days of not being seen by medical, Ross inquired with one of the nurses why medical had not come to see him, and she told him he was not on their list.  The same day (which was Saturday, November 14, 2000), another inmate who said he was "sick as hell" and had tested positive was placed in the cell with Ross.  Ross sent a yellow request slip complaining to Russell that he was concerned about being in the same cell with that inmate and the possibility that he could get a stronger strain of the virus that could affect his asthma.  (*Id.* ¶¶ 66–74.)

On Monday, November 16, 2000, Ross was told to pack his property and was escorted to a medical holding cell in the segregation unit.  The escorting officer, Officer Edwards, told Ross that someone had "dropped the ball" on Friday when the moves were being done, that he had actually tested negative for COVID-19, and that he should have been moved with the other negative inmates.  Because he had a negative test, no one from medical had come to see him.

Ross faults Keller and Robertson for the mistake, who he says were responsible for inmate housing assignments. (*Id.* ¶¶ 75–78.)

Ross was placed in a "negative pressure cell that's used for the most serious COVID-19 conditions." Another inmate, who had been housed in the same cell for days and been very ill, had been in that cell that day and had been released, and Ross was moved into that cell without it being cleaned first. (*Id.* ¶¶ 79–81.)

Later that same evening, Ross was scheduled to be moved to permanent housing, but he started feeling ill. Based on a report by an officer to the medical staff, Ross was instead kept in the same cell. The next day, he was given another COVID-19 test, which came back positive. As a result of COVID-19, he "suffered agonizing pain, trouble breathing, fever, chills, and night sweats for days, [and] contemplated suicide for days as he suffered."[4] (*Id.* ¶¶ 82–87.)

He was given vitamins and Gatorade to cope with his symptoms. (*Id.* ¶ 88.) After his worst symptoms were over, he was sent back to the 4-E housing unit and assigned to sleep on the floor of a two-man cell that he shared with two other inmates. (*Id.* ¶ 89.) He was required to sleep "next to the toilet in urine" while trying to recover, for an unspecified period of time. (*Id.* ¶ 90.)

### 4. Allegations Concerning the Grievance Procedure

Ross had difficulty getting official grievance forms and some forms he submitted either received no response or they were lost. Requests directed to certain high-ranking defendants, such as Superintendent Russell or Major Hayes, were answered by other employees. Defendant Bevil told Ross and others complaining about not getting grievance forms that they were "wasting [their] time" and that the officers had "immunity" and could not be sued. (*Id.* ¶¶ 92–

---

[4] Ross suffers from mental illness and had previously attempted suicide just months before, in September 2020.

93.)  This was a violation of policy and denied inmates of the ability to exhaust their

administrative remedies.  (*Id.* ¶ 102.)

## C. Ross's Claims

Ross's complaint lists three "causes of action," although there is some overlap between

them.  All appear to be brought against all defendants and appear to be premised on the Eighth

Amendment.[5]  In the first, he claims that defendants violated his Eighth Amendment rights when

they created overcrowded and unsafe living conditions, including the renting of bed space to

Franklin County COVID-19 positive inmates.  The unsafe living conditions were created in part

by their failure to take adequate steps to prevent the risk of exposure to inmates, including:

- failing to provide adequate personal protection equipment to employees and staff;
- failing to adequately quarantine "COVID-19 positive" inmates (including housing positive and negative inmates in the same units and cells);
- allowing positive inmates to work in the kitchen and handle food;
- creating a "stressful" environment for the Jail's employees by failing to protect them, causing them to act and behave indifferently, such as failing to secure doors, which improperly allowed inmates to mingle; and
- failing to adequately clean shared items.

(Am. Compl. 23–24.)

With regard specifically to himself, Ross alleges that defendants failed to move him out

of the unit after his negative COVID-19 test in November 2020, placed him in an unclean

medical cell without decontaminating it, and later assigned and forced him to sleep on the floor

of a cell next to the toilet in urine for an unspecified amount of time, while recovering from

COVID-19.  (*Id.* at 23.)

The second cause of action appears to be primarily directed toward the Medical

---

[5]  Ross also uses the terms "equal protection" and "due process" in describing his causes of action.  (Am. Compl. 23 (referencing a violation of his "right to equal protection from harm"); *id.* at 25 (referencing the "Fourteenth Amendment"); *id.* at 26 (stating that defendants' actions violated his "rights to due process and protection from harm").  The court does not construe his complaint as raising any claim based on either the Equal Protection Clause or the Due Process Clause, in part because his allegations wholly fail to state an equal protection violation or a due process violation.

Defendants.[6]  It claims that they were deliberately indifferent to Ross's health and safety when they "falsified" the COVID-19 test results of inmate Hampton and others, making COVID-19 tracing impossible, and treated Ross and other inmates' COVID-19-related complaints as "routine."  Ross further alleges, albeit without any supporting facts, that they "delayed the medical treatment and [assessment] of COVID-19-related symptoms."  He also alleges, again without specifics, that they "failed to adequately treat" him for COVID-19 and to "provide mental health counseling."  (*Id.* at 24–25.)

The third cause of action repeats assertions from the first two causes of action.  It also includes assertions based on the availability and use of the grievance procedure.  Specifically, Ross asserts that defendants denied him timely grievances and responses to request slips, adopted a policy or practice or custom to prevent complaints from reaching certain defendants, and provided blanket generic responses to all inmate complaints regarding COVID-19.  (*Id.* at 25–26.)

## II.   DISCUSSION

### A.  Legal Standard for Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–63 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  To withstand a Rule 12(b)(6) motion, a pleading must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678.  In considering the motion, the court must construe the facts and reasonable inferences "in the light most

---

[6]  To the extent he intended to include other defendants in this claim, all allegations against them are also included in Claim One, except for the assertion that they "failed to investigate complaints that medical staff was falsifying the COVID-19 test results of inmates."  (Am. Compl. 25.)  For the reasons discussed in this opinion, however, there was no constitutional violation in the alleged "falsification" of another inmate's test results.  A failure to investigate something that is not a constitutional violation does not constitute an independent violation.  The court does not discuss that issue further.

favorable to the nonmoving party." *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano*, 521 F.3d at 302. *Pro se* complaints are given a liberal construction. *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006).

## B. Medical Defendants

As noted, Ross's second cause of action faults the Medical Defendants for: (1) "falsifying" the COVID-19 test results of inmate Hampton and others, making COVID-19 tracing impossible; (2) treating Ross's and other inmates' COVID-19-related complaints as "routine"; and (3) failing to adequately treat him for COVID-19 and failing to "provide mental health counseling." None of these three alleged actions sufficiently state a claim against either Medical Defendant. The court addresses them in reverse order. The court turns first to his Eighth Amendment claim that he was not given adequate treatment or mental health counseling.

"It is beyond debate that a prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019). To demonstrate deliberate indifference, an inmate must show that (1) he has a medical condition that has been "diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention" and (2) the defendant "had actual knowledge of the plaintiff's serious medical needs and the related risks, but nevertheless disregarded them." *Id.* at 356–57; *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). The first component is an objective inquiry and the second is subjective. *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017).

To establish deliberate indifference, a plaintiff must present facts to demonstrate that the defendant had actual knowledge of an objectively serious medical need and disregarded that need. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Rish v. Johnson*, 131 F.3d 1092,

1096 (4th Cir. 1997).  To qualify as deliberate indifference, the defendant's conduct must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.  *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

First of all, as the Medical Defendants note, there are no allegations as to any particular action or inaction by Dr. MacDonald.  Plaintiff has not alleged that he was ever treated by Dr. MacDonald or that Dr. MacDonald knew of and ignored his condition.  The failure to allege any knowledge of his condition is fatal to Ross's deliberate indifference claim against MacDonald. *See Gordon*, 937 F.3d at 356–57.

It appears that Ross is attempting to hold both Dr. MacDonald and Wellpath liable because they are a supervisor and employer of other medical personnel, respectively.  But there is no vicarious liability or respondeat superior liability under § 1983.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  Thus, the court construes his claim against Dr. MacDonald as a supervisory liability claim, and the claim against Wellpath as a *Monell*-type claim.[7]  Both claims fail.

As to Dr. MacDonald, Ross has failed to allege any basis to hold him liable.  To establish supervisory liability, Ross must allege facts sufficient to show (1) that the defendant "had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff"; (2) that the defendant's "response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'"; and (3) that there was an "affirmative causal link" between the defendant's conduct and plaintiff's "particular constitutional injury."  *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).  The facts alleged by Ross do not come close to plausibly

---

[7] *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690 (1978).

alleging those three elements.  Among other failures, he fails to allege or present any evidence that Dr. MacDonald had actual knowledge of the facts underlying his claims (the allegedly falsified tests, treating complaints as routine, or any claim with regard to Ross's own treatment), or constructive knowledge based on such occurrences being widespread.  His attempt to hold Dr. MacDonald liable on a supervisory liability theory thus fails.

Likewise, his claim against Wellpath for its "policies" also fails.  Although Wellpath is not a government entity, its motion appears to acknowledge that it acts under color of state law in providing medical services to inmates pursuant to a contract, and it analyzes the claim against it as a *Monell* claim.  *Monell* explains that "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690 (1978).  The entity is liable under § 1983 only when the entity itself is a "moving force" behind the deprivation.  *Polk Cty. v. Dodson*, 454 U.S. 312, 326 (1981).  That is, the entity's official policy or custom must have played a part in the alleged violation of federal law.  *Oklahoma City v. Tuttle*, 471 U.S. 808, 817–18 (1985).

Although Ross summarily alleges that Wellpath had a policy or custom of falsifying records and of treating COVID-19 symptoms as "routine," he has not alleged facts to show either was, in fact, an official policy or custom or that either caused a violation of his rights.  The court addresses first his assertion that other inmates' COVID-19-related complaints were treated as "routine" as a policy, delaying treatment to him and others.

The only evidence he presents of this "policy" is that, with regard to inmate Anders's complaints, a nurse triaged Anders and checked "routine," as opposed to "emergency" or "urgent."  That is an insufficient basis on which to hold either medical defendant liable.  First of

14

all, Ross has not alleged that the nurse's judgment was incorrect about Anders's symptoms being routine. The fact that medical symptoms are not classified as an "emergency" or "urgent" does not mean that they are not being treated appropriately or in a timely fashion.[8] So, the documents Ross relies upon cannot support the weight Ross asks them to bear.

Second, even if Anders's complaints were improperly classified as "routine," that does not demonstrate an official custom or policy of doing so. Indeed, Ross's own allegations refute that the medical personnel were being casual in their treatment of COVID-19. As he notes, there was mass testing of inmates, and Ross was tested at least three times. Inmates were given vinyl cloth masks, inmates who tested positive were quarantined or separated, and Ross was promptly isolated and treated for COVID-19 after he contracted the illness. These actions are not the type of treatment that "shock the conscience," *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), as required to constitute an Eighth Amendment violation.

Moreover, Ross does not allege that *his* complaints were treated as "routine," improperly or otherwise. Thus, even if there were some policy of treating COVID-19 complaints as "routine" and even if that policy violated some other inmate's constitutional rights, it did not lead to any violation of Ross's rights.

Indeed, Ross's allegations themselves lack facts showing deliberate indifference or delayed treatment by any medical personnel. He complained that he did not feel well to an officer, and the officer relayed that information to medical personnel. He was tested for COVID-19 the next day, was quarantined, and was treated with Gatorade and vitamins. Although he claims he experienced more severe symptoms, he does not allege that he reported any of those symptoms to anyone, much less to any medical personnel, or that his symptoms were caused by

---

[8] Indeed, Anders brought his own lawsuit, and another judge of this court granted Wellpath summary judgment "on Anders's claim that it had a policy of treating COVID-19 complaints as routine that caused him harm." *Anders v. Russell*, No. 7:21-cv-00030, 2022 WL 726923, at *7 (W.D. Va. Mar. 10, 2022).

15

or had any relationship to the Medical Defendants' policies.[9]  Nor does he allege that either Dr. MacDonald or anyone at Wellpath was made aware that he was suffering and not receiving treatment.

Accordingly, to the extent that he is alleging he was not timely or properly treated as a result of the treatment of complaints as "routine," he offers no specific allegations as to what treatment he required or wanted that he was not given.  Indeed, he provides no *facts* at all to support conclusion that he was not provided adequate and timely treatment.

Moreover, as defendants note, even if he received inadequate or negligent care, that is insufficient to state a constitutional violation.  *Estelle*, 429 U.S. at 106.  Because Ross only summarily alleges that his treatment was inadequate or delayed and does not identify any specific person that was aware of his symptoms and acted with deliberate indifference toward him, he has failed to state an Eighth Amendment claim based on his medical care.

As to Ross's allegations about "falsified" test results, the Medical Defendants correctly note that Ross cannot assert claims on behalf of other inmates.  In his response, Ross argues that he is not trying to bring claims on behalf of any other inmate or to advance any other inmate's rights.  He explains that his purpose is raising the treatment of other prisoners, or the "falsification" of their records, it "to show that the Defendants have a practice, habit and a custom of doing the things alleged."  (Resp. Opp'n to Med. Defs.' Mot. Summ. J. 4, Dkt. No.

---

[9]  Although the court does not rely on them in making its decision, Ross's medical records—the accuracy of which he does not challenge—further bolster the court's conclusion.  They confirm that he was regularly observed in the weeks after his positive test and also that he routinely refused treatment.  They reflect that between November 17, 2020, (when Ross first tested positive) and December 2, 2020, he was "seen by a medical staff member almost every day, sometimes more than once per day, for a symptom check and vital signs check and medical sick calls.  Other than reporting a headache during a medical sick call on November 19th, [Ross] did not report any symptoms and refused almost every symptom check and vital sign check."  (Affidavit of Roy William Prillaman, III ¶ 3, Dkt. No. 53-1 and exhibits thereto, including "Refusal of Treatment" forms).  His medical records reflect that he was given Zinc and Vitamin D for treatment.  Also, Ross submitted two (2) Healthcare Request forms during this time period, and they do not appear to be related to COVID-19 symptoms.  One said he needs "peroxide," and "it's working but nobody's bringing it to me."  (Dkt. No. 53-2, at 33.)  The other stated that he needed "the warm compress for [his] hamstring."  (*Id.* at 34.)

56.)

But Ross does not allege facts showing an official policy or custom of falsifying medical records.  Inmate Justin Hampton has provided an affidavit saying he was given test results on one occasion when he had not been tested, and Ross suggests that Hampton is not the "only inmate to make the claim that [defendants] falsely reported test results," but just an example. (*Id.* at 5.)  He has not set forth any specific allegations, however, as to any other inmates who are alleging that they received test results but were not tested.  And he certainly has not alleged facts to show this was an official custom or policy of Wellpath's.

Ross notes that there was mass testing on occasion in November, and he was tested a number of times.[10]  While it is unfortunate that there was an error—or even an intentional falsification of Hampton's record—there is no evidence that this was such a widespread problem that Wellpath had to have known about it.  This is particularly true given the large number of tests performed during that time-frame.  Because he has not identified any official custom or policy that resulted in the violation of his rights, Ross's claims against Wellpath fail.

The other policies that Ross challenges are Jail policies, and he does not allege that the Medical Defendants played any role in creating those policies.  For example, he does not allege that either of the Medical Defendants had any role in determining where he or other inmates would be housed.  Indeed, he specifically alleges, in several places in the complaint, that it was certain of the Correctional Defendants that made those decisions.  Thus, that is not something for which he can hold the Medical Defendants liable.

For the foregoing reasons, the court concludes that the Medical Defendants are entitled to

---

[10]  According to an affidavit submitted by the Medical Defendants related to identifying the Doe defendants, it appears that up to 100 inmates were being tested per day during November 2020, in addition to medical personnel being tasked with conducting daily rounds for those who tested positive, providing treatment for inmates who were symptomatic, and managing and treating the overall health of the inmates.  (Travitz Aff. ¶ 5, Dkt. No. 88-1.)

the dismissal of all claims against them, and their motion (Dkt. No. 52) will be granted.

## C.  Correctional Defendants

### 1.  Eighth Amendment Claim Based On Conditions That Led to Him Contracting COVID-19

Ross's first claim against the Correctional Defendants challenges the conditions and policies that led to him contracting COVID-19.  This includes his temporarily being housed with a symptomatic inmate after he mistakenly was left in the unit as if he had tested positive for COVID-19, when he had actually tested negative.  The court construes these as claims that his conditions of confinement violated his Eighth Amendment rights.  As discussed next, Ross has failed to allege facts sufficient to entitle him to relief on those claims.

The Eighth Amendment protects prisoners from cruel and unusual living conditions. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  To plead such a claim requires facts showing that: (1) objectively, the deprivation was sufficiently serious, in that the challenged, official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834.  To satisfy the first element, the prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions.  *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

To show deliberate indifference, the plaintiff must show that the prison officials actually knew of and disregarded the serious risk of harm posed by the conditions.  That standard is the equivalent of "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839.  "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Courts have recognized that the risk of exposure to a serious infectious disease can satisfy the first element of an Eighth Amendment conditions claim.  See *Hutto v. Finney*, 427 U.S. 678 (1978); *Helling v. McKinney*, 509 U.S. 25, 35 (1993).  And lower courts have concluded that serious communicable diseases can present a substantial risk of serious harm to inmates.  *See, e.g.*, *Beagle v. Schwarzenegger*, 107 F. Supp. 3d 1056, 1069 (E.D. Cal. 2014) (valley fever); *Hemphill v. Rogers*, No. CIV.A. 07-2162JAG, 2008 WL 2668952, at *11 (D.N.J. June 27, 2008) (scabies); *Kimble v. Tennis*, No. CIV. 4:CV-05-1871, 2006 WL 1548950, at *4 (M.D. Pa. June 5, 2006) (methicillin-resistant staphylococcus aureus ("MRSA")); *Jeffries v. Block*, 940 F. Supp. 1509, 1514 (C.D. Cal. 1996) (tuberculosis).

The potential spread of COVID-19, too, has been held to satisfy the objective element of an Eighth Amendment claim.  *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (concluding, at least before vaccines were available, that the objective prong was "easily satisfied" by the transmissibility of the COVID-19 virus and seriousness of its symptoms, in conjunction with other factors).  Additionally, Ross has stated that he suffers from chronic conditions—asthma and high blood pressure—that the CDC has identified, as of the date of this opinion, as conditions that put an individual at a higher risk to develop serious COVID-19 complications.  *See United States v. Brown*, No. 20-7095, 2021 WL 4461607, at *2 & n.3 (4th Cir. Sept. 29, 2021) (recognizing CDC guidance as to high blood pressure); *Patterson v. United States*, No. 2:17-CR-00114 (01), 2022 WL 610175, at *3 (E.D. Va. Mar. 1, 2022)  (citing to CDC guidance as to both high blood pressure and asthma).[11]

Based on the foregoing, the court concludes that the existence of COVID-19 within the

---

[11]  As of June 2020, the CDC listed both conditions only as ones that "might" increase a person's risk. Centers for Disease Control and Prevention, "CDC updates, expands list of people at risk of severe COVID-19 illness" (June 25, 2020), available at https://www.cdc.gov/media/releases/2020/p0625-update-expands-covid-19.html (last visited March 9, 2022).

Jail satisfies the objective component of an Eighth Amendment conditions-of-confinement claim. Ross has not pled sufficient facts, however, to show that any of the defendants were deliberately indifferent toward that risk.

First of all, although Ross states that he is naming each defendant in his or her individual and official capacities, very few of the allegations in the complaint relate to specific individuals or their actions.  Instead, as the Correctional Defendants note, "Ross seems to take issue[] with the [Western Virginia Regional Jail Authority's ("Jail Authority")] response to the pandemic as a whole."  (Corr. Defs.' Mem. Supp. Mot. Dismiss 5, Dkt. No. 75.)

To the extent Ross is making such a claim against the individual defendants, though, for many of them, he does not allege any actions that could be determined to constitute "deliberate indifference" toward a substantial risk of harm to him.  By way of example, several of the defendants merely said insensitive things to him, suggesting that they did not care if inmates got sick, but he did not identify any actions by those defendants that exhibited deliberate indifference.  As with the medical defendants, then, Ross has not alleged or shown that any of the individual defendants knew of and disregarded an excessive risk to his health and safety, an "exacting" standard.  *Jackson v. Lightsey*, 775 F.3d 170, 178.

To the extent he attempts to hold individual defendants liable for their role in creating or implementing policy, moreover, his claims fail to allege a constitutional violation. This is so because his allegations are insufficient to show "subjective recklessness" on the part of the defendants.

Several circuit courts of appeal and a number of other district courts have all held that measures similar to what was in the Jail's policy here, and even the occasional failure of the policies to be followed, did not rise to the level of an Eighth Amendment violation. *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (concluding that similar policies and procedures

were evidence that prison officials were not deliberately indifferent to the risk posed by COVID-19); *Swain v. Junior*, 961 F.3d 1276, 1287 (11th Cir. 2020) ("Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with 'subjective recklessness as used in the criminal law.'") (quoting *Farmer*, 511 U.S. at 839–40); *Grinis v. Spaulding*, 459 F. Supp. 3d 289, 292 (D. Mass. 2020) ("These affirmative steps may or may not be the best possible response to the threat of COVID-19 within the institution, but they undermine an argument that the respondents have been actionably deliberately indifferent to the health risks of inmates."); *Chunn v. Edge*, 465 F. Supp. 3d 168, 203 (E.D.N.Y. 2020) (a prison's measures to combat COVID-19 "indicate that prison officials are trying, very hard, to protect inmates against the virus and to treat those who have contracted it, and belie any suggestion that prison officials have turned the kind of blind eye and deaf ear to a known problem that would indicate deliberate indifference.") *See also Simmermaker v. Trump*, No. 20-cv-01671-KMT, 2021 WL 915985, at *4 (D. Colo. Mar. 10, 2021) (the inability to maintain social distancing while using computer terminals or telephones or when interacting with their cellmates does not demonstrate defendants disregarded the risk of COVID-19).  Additionally, the fact that defendants' efforts were unsuccessful does not mean that they were unconstitutional.  *See Farmer,* 511 U.S. at 844; *Ryan v. Nagy*, No. 2:20-CV-11528, 2021 WL 6750962, at *9 (E.D. Mich. Oct. 25, 2021), *report and recommendation adopted in part,* No. 20-11528, 2022 WL 260812 (E.D. Mich. Jan. 26, 2022) ("The Eighth Amendment does not mandate perfect implementation. . . . Even if Defendant's measures were ultimately unsuccessful at stopping all coronavirus infection with the jail, they were reasonable and thus not unconstitutional.")

The Fifth Circuit's decision in *Valentine v. Collier*, 978 F.3d 154 (5th Cir. 2020), is

particularly instructive.[12]  The *Valentine* Court held that the district court erred in concluding

that plaintiffs had shown deliberate indifference to the risk of COVID-19.  The appellate court

emphasized the policies put in place by the defendants, which included suspension of in-person

visitation, requirements for social distancing and masks, testing, education to inmates, increased

access to soap and toilet paper, and isolation of positive inmates, and it concluded that they were

sufficient to show that defendants were not deliberately indifferent.  This was true despite the

fact that the district court had found the prison failed to enforce social distancing in the relevant

unit, did not increase the janitorial staff's access to training or supplies, staff regularly violated

the mask policy, surfaces were not cleaned regularly, no hand sanitizer was available, many

sinks were broken, and the turnaround time for COVID-19 tests (at least at the beginning of the

pandemic) was more than a week.  *Id.* at 164.  The Fifth Circuit reasoned that, in focusing on

these deficiencies and on what more the prison could have done to stop the spread of the disease,

the district court had held the prison "to a higher standard than the Constitution imposes. . . . The

Eighth Amendment does not enact the CDC guidelines."  *Id.*  Acknowledging the "lapses" in the

prison's response, the *Valentine* court explained that, as a matter of policy, the prison could have

done more to protect vulnerable inmates, but that is not the Eighth Amendment standard.  *Id.* at

165.

As in *Valentine*, there was perhaps more the Jail administrators could have done, and

Ross has alleged lapses similar to those identified in *Valentine*.  And perhaps the decision to

---

[12]  In his motion for preliminary injunction, which the court denied because Ross subsequently had been transferred from the Jail, Ross cites to a portion of a dissenting opinion from the Supreme Court (concerning the injunctive relief addressed by the Fifth Circuit) in which the dissenters contended that the Fifth Circuit was wrong in its analysis. *Valentine v. Collier*, 141 S. Ct. 57 (2020) (Sotomayor, dissenting from the denial of application to vacate stay).  Not only was this opinion a dissent, so it has no precedential value, but the facts in *Valentine* involved widespread and "consistent non-compliance" with "obvious precautionary public health measures." *Id.* at 58.  Here, by contrast, Ross's own factual allegations show that there was in fact substantial *compliance* with the policies, and he offers only summary general statements of "non-compliance" and only a few specific examples.

house the Franklin County inmates at the Jail was ill-advised.[13]  But Ross has not alleged that the defendants or the Jail Authority turned a blind eye to the risk of COVID-19 or failed to act reasonably in response.  The evidence before the court—including the policy itself, portions of which Ross provided, and the entirety of which defendants provided, *see* Dkt. No. 29-2—shows instead that the defendants tasked with creating the comprehensive pandemic policy, and the policy itself, was a reasonable attempt to respond to the known risk of COVID-19 exposure. (*See generally* Dkt. No. 29-2, at 1–23.)

For example, the plan included requirements that employees self-quarantine and self-isolate where appropriate; provided for personal protective requirement, education of employees, inmates, and visitors; restricted ill employees or visitors from the workplace; put in place barriers and other personal distancing measures; made alcohol dispensers or hand sanitizers available in employee work areas; and stated that vaccines would be provided once available.  The response protocols (different levels, with increased measures if a confirmed case of COVID-19 occurs within WVRJ, and even additional measures if more than one case occurs) provided for all new offenders to be screened immediately for symptoms, quarantining and separating symptomatic inmates, additional steps regarding the use of masks and gloves during food service and laundry for quarantined inmates, the suspension of visitation, sanitation of common areas and shared devices each lockdown period, and other tactics designed to prevent the spread of the disease. (*See generally id.*)  The Correctional Defendants also have provided an inspection by VDOC, conducted in June 2020, which confirmed that there were no deficiencies in the Jail's procedures or policies.  (*See generally* Dkt. No. 29-2, at 24–38.)

Importantly, moreover, Ross's own allegations confirm that defendants took steps to limit

---

[13]  Because the court is ruling on a motion to dismiss, it does not know the reasons why the decision was made or what the circumstances were at the Franklin County Jail that led to the transfer.

transmission of the disease among inmates (such as lockdowns, quarantining, separating ill or positive inmates, the provision of masks, and extensive testing). His assertion that inmates were being "shuffled back and forth," too, reflects at least a good-faith attempt to separate ill inmates from inmates who tested negative during what appears to have been a significant outbreak under difficult circumstances.

To be sure, Ross also identifies times when the policies were *not* followed and alleges that inmates were not always properly quarantined, properly separated, or properly tested, and equipment and cleaning supplies were not always readily available. But like the lapses in *Valentine*, these allegations must be considered in conjunction with all steps that the prison officials did take to respond to the known risk. And as in *Valentine*, the totality of the allegations here do not reflect that any of the defendants in charge of creating or implementing overall policies were deliberately indifferent as that term is defined in *Farmer*. *See Baxley v. Jividen*, No. 3:18-1526, 2020 WL 1802935, at *6 (S.D. W. Va. Apr. 8, 2020) (noting, in context of denying preliminary injunction, that plaintiffs likely could not show deliberate indifference where defendants' actions showed that they had a plan in place to try to limit transmission of COVID-19).

Another judge of this court recently dismissed very similar claims brought by another inmate as a result of the same basic policies, practices, and factual circumstances. *Anders v. Russell*, No. 7:21-cv-00030, 2022 WL 726923 (W.D. Va. Mar. 10, 2022). In his opinion, Judge Jones also concluded that the plaintiff's "own allegations about COVID-19 measures at WVRJ refute any claim of deliberate indifference." *Id.* at *5. In doing so, Judge Jones also cited to *Baxley*.

As the *Baxley* court explained, "[t]he existence and ongoing implementation of Defendants' COVID-19 response plan makes it impossible to conclude that Defendants 'actually

knew of and disregarded a substantial risk . . . . In fact, the opposite seems to be the case: Defendants have demonstrated actual knowledge of the risk of COVID-19, and regard it with the seriousness it deserves." *Baxley*, 2020 WL 1802935, at \*19–20 (S.D. W. Va. Apr. 8, 2020); *see also id.* ("Mitigation is all that can be demanded in this case, as no technology yet exists that can cure or entirely prevent COVID-19.  The best scientists in the world have been unable to eliminate the risk of the disease, and the Court can expect no more of Defendants."); *Tillery v. Va. Peninsula Reg'l Jail*, No. 1:20cv751, 2020 WL 6742991, at \*5 (E.D. Va. Nov. 17, 2020) ("Plaintiff has not established deliberate indifference . . . simply because another inmate, who had been released from a COVID-19 quarantine, was assigned as his cellmate. '*Every person in the United States, whether in a detention facility or not, faces COVID-19 exposure.*'") (quoting *Toure v. Hott*, 458 F. Supp. 3d 387, 408 (E.D. Va. 2020)).

Moreover, as to the defendants who Ross singles out for not properly following procedure—Sawyer, Maddy, and Brown—the court concludes that Ross has not pled sufficient facts to hold those individuals liable for being "deliberately indifferent."  For example, defendant Sawyer's entering a unit through the wrong door, or Maddy's leaving a door open on a single occasion, which allowed inmates to mingle, would not, without more, allow a jury to find that either was deliberately indifferent.  To begin with, it's unclear from Ross's allegations whether either defendant did so purposefully, as opposed to negligently, and he does not allege that Maddy actually saw or knew that inmates were mingling as a result.  Also, both made comments suggesting that they believed the inmates and staff would all get sick regardless of what was done.  While Ross interprets these comments as evidence of "deliberate indifference," the belief that everyone was likely to get sick also means that these defendants did not subjectively believe that their actions were likely to increase any risk to inmates.  And there is no allegation that either incident even minimally increased the risk to Ross specifically.  Moreover, a correctional

officer's "failure to follow internal prison policies [is] not actionable under § 1983 unless the alleged breach of policy rises to the level of a constitutional violation." *Jackson v. Sampson*, 536 F. App'x 356, 357–58 (4th Cir. 2013). For the reasons already explained, the violations of policy here do not constitute an Eighth Amendment violation.

Even Officer Brown's alleged conduct in not wearing a mask on one occasion cannot give rise to an Eighth Amendment claim in the absence of information as to where Brown was located relative to other inmates or how long he was maskless. Moreover, there is no allegation that Brown was close to Ross or that his failure to wear a mask on one occasion significantly increased the risk to Ross or other inmates of contracting the disease. Ross also has not alleged that any supervisor was aware of this incident or that it was a widespread or recurring problem.

As to the error concerning Ross's test results (or housing assignment), the court understands Ross's frustration at mistakenly being left in a unit with inmates who tested positive for the virus and the fact that, shortly after the mistake was discovered, he also tested positive and became ill. Someone clearly made a mistake in failing to move him when the other inmates who had tested negative were moved. But there is no allegation that any of the named defendants were responsible for the mistake or, importantly, that the mistake was intentional or deliberate. Indeed, even at the time, an officer told Ross that someone had "dropped the ball." The incident, then, while certainly unfortunate, was the result of negligence. And negligence alone is insufficient to state a constitutional violation. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold" of constitutional protections).

Even if any of the defendants were deliberately indifferent, though, the court concludes that the individuals named are entitled to qualified immunity as to Ross's claims, which would

apply to all claims against them in their individual capacities. The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The burden of proof is on the party seeking qualified immunity. *Wilson v. Prince George's Cty., Md.*, 893 F.3d 213, 219 (4th Cir. 2018).

In determining whether an official is entitled to qualified immunity, courts engage in a two-pronged inquiry. *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The first prong asks whether the facts, taken in the light most favorable to the party asserting the injury, show the defendant's conduct violated a constitutional right. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The second prong asks whether the right was "clearly established" at the time of the defendant's conduct. *Id.* If the answer to either prong is "no," the official is entitled to qualified immunity.

As applied here, it would not have been apparent to any of the defendants that their alleged conduct would violate Ross's clearly established constitutional rights. The COVID-19 pandemic was a new and unusual issue, and there was ongoing and changing guidance from health officials at both the state and federal levels. The Jail Authority and officials at the Jail implemented protocols and policies and procedures to deal with the pandemic, which was a difficult situation for the whole of society and every business, but especially for congregate settings like prisons. Even if some of these policies were insufficient, and even if they were not always followed, neither the policies or occasional lapses were clearly insufficient to protect prisoners, given the novelty of the virus and the questions—and evolving guidance—as to how to prevent its spread and treat it. *See Ryan*, 2021 WL 6750962, at *9 (finding defendant jail officials were entitled to qualified immunity on similar claims and explaining that "[t]he

world's understanding of COVID-19 is constantly evolving, and there is no precedent that would have made it clear to a reasonable official that the measures Defendants took unreasonably responded to the COVID-19 pandemic"); *see also Tate v. Arkansas Dep't of Corr.*, No. 4:20-cv-558, 2020 WL 7378805, at *11 (E.D. Ark. Nov. 9, 2020) (granting qualified immunity to jail officials who took precautionary measures in response to the pandemic because, even if they were inadequate, they were not clearly so; and reasoning that "COVID-19 is, by definition, a 'novel' coronavirus" which has posed challenges "unlike any other in the modern era," so a "reasonable official" would not have known if defendants' response violated the plaintiff's clearly established rights").  Accordingly, the court concludes that, as to any claims against them in their individual capacities, all of the Correctional Defendants are entitled to qualified immunity and those claims must be dismissed.

### 2.  *Monell* Liability Against the Jail Authority

Because Ross's allegations fail to set forth deliberate indifference against any individual, the same policies cannot give rise to official-capacity liability, either.  At bottom, Ross's own allegations about the testing, quarantining, and separation of inmates, although imperfectly administered and sometimes significantly so—reflect that the defendants responsible for those policies were making reasonable efforts to curb the spread of the virus, as already discussed.  No deliberate indifference has been sufficiently alleged.

Ross's claims based on the policies and housing decisions at the Jail are more properly construed as a claim against the Jail Authority itself, who Ross did not even name as a defendant. The court discusses those claims separately as claims pursuant to *Monell*.

Ross has not adequately alleged a *Monell* claim against the Jail Authority, either.  As discussed with regard to the claims against Wellpath, "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is

28

alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690.  To be liable, the Jail Authority must have been itself a "moving force" behind the deprivation.  *Polk Cty.*, 454 U.S. at 326.  That is, the entity's official policy or custom must have played a part in the alleged violation of federal law.  *Tuttle*, 471 U.S. at 817–18.  But as already discussed, the policies in place, including the decision to house Franklin County inmates, do not show deliberate indifference and do not allege a violation of Ross's constitutional rights.  Ross's *Monell* claim thus fails.

### 3. Eighth Amendment Claim Based On Cell Conditions After Contracting COVID-19

The court has discussed the Eighth Amendment claim based on policies related to COVID-19.  To some extent, this includes the alleged overcrowding and Ross's discontent with the Franklin County inmates being brought to the Jail.  But Ross also makes a separate claim that, because of the overcrowding, he was later forced to share a two-person cell with two other inmates and had to sleep on the floor next to the toilet.

To support his overcrowding allegations, Ross points to a VDOC "inspection report" that shows that the Jail has an operational cap of 605 inmates and was already over that cap as of the June 2020 inspection, housing 718 inmates.  He then cites to a newspaper article quoting defendant Russell as saying the Jail was housing "830 inmates," after transfer of the Franklin County inmates.  (*Id.* ¶¶ 99–100.)  Ross offers no explanation based on personal knowledge about what the "operational cap" means, however, and publicly available information from the Jail suggests that the number can be exceeded without jeopardizing inmate safety.  Western Virginia Regional Jail Authority, *Interesting Facts & Statistics*, available at https://www.wvarj.org/169/Interesting-Facts-Statistics#:~:text=The%20facility%20covers%206%20acres,to%20805%20general%20population%20beds (last visited March 7, 2022) ("The

facility . . . has a rated capacity of 605 inmates.  Due to an increase in population, additional beds were added to expand the bed count to 805 general population beds. . . . The facility can be expanded to hold an additional 649 inmates.").  (*See also* Dkt. No. 29-2, at 24 (June 2020 "Jail Inspection Report" by the Virginia Department of Corrections) (indicating that the Jail was 100% compliant with all requirements, and noting that the capacity of the Jail was 605 inmates, but the current inmate population was 718).

As noted, Ross spent several weeks after his diagnosis in a cell where he says he recovered from the worst of his symptoms.  After being released from that cell, he alleges that he was forced to sleep on the floor next to the toilet while recovering from COVID-19 for an unspecified number of days.

As explained earlier, a plaintiff succeeds on an Eighth Amendment living conditions claim by showing that: (1) objectively, the deprivation was sufficiently serious, in that the challenged, official acts caused denial of "the minimal civilized measure of life's necessities"; and (2) subjectively, the defendant prison officials acted with "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834.

The court concludes that Ross's claim about his cell condition in early December is insufficient to satisfy the objective component of an Eighth Amendment conditions-of-confinement claim.  *Plyler v. Leeke*, 804 F.2d 1251, 1986 WL 18030, at *3 (4th Cir. 1986) (unpublished table decision) (calling it "well settled" that overcrowding of prisons, including double or triple celling, does not necessarily violate the Constitution); *Crowe v. Leeke*, 540 F.2d 740, 742 (4th Cir. 1976) (holding that confining three inmates to a small cell on a temporary basis, even if one had to sleep on the floor, did not constitute an Eighth Amendment violation). Relying on *Crowe*, courts within the Fourth Circuit have routinely dismissed Eighth Amendment claims (or Fourteenth Amendment claims of pretrial detainees) based on similar allegations of

short-term overcrowding. *E.g.*, *Bennett v. Nix*, No. 4:18-CV-2781-JMC-TER, 2020 WL 608348, at *3 (D.S.C. Jan. 7, 2020), *report and recommendation adopted,* No. 4:18-CV-02781-JMC, 2020 WL 607206 (D.S.C. Feb. 7, 2020) (pretrial detainee slept in "arraignment room" on the floor (and near the toilet) with six other prisoners, for a period of almost three weeks); *Gray v. V.B.C.C. Inmate Hous.*, No. 1:14CV414 TSE/TCB, 2014 WL 3420483, at *3 (E.D. Va. July 9, 2014) (inmate had to sleep on the floor near the toilet "at various times"); *Oliver v. Butler*, No. 5:12-CT-3060-FL, 2015 WL 846755, at *6 (E.D.N.C. Feb. 26, 2015) (inmate slept on a mattress on the floor for five days due to overcrowding); *Parkerton v. Brooks*, No. CV GLR-19-1403, 2020 WL 4732138, at *7 (D. Md. Aug. 14, 2020) (inmate slept one night without a mattress and blanket).

As in *Crowe*, moreover, Ross has failed to show that the overcrowding or cramped cell conditions resulted from prison rules which can be characterized as "vindictive, cruel, or inhuman" or that the overcrowding resulted from an "arbitrary or capricious" exercise of judgment by prison officials. *See Crowe*, 540 F.2d at 742. Instead, as already discussed, the overcrowding appears to be the result, at least in part, of the Jail's administrators' attempt to segregate sick inmates and keep COVID-19 positive and negative inmates separate.

Because Ross cannot establish the objective component of his Eighth Amendment conditions-of-confinement claim based on his cell housing for the end of his recovery from COVID-19, this claim fails.

### 4.   Denial of the Grievance Process

Ross's third cause of action appears to assert claims based on a denial of the grievance process, or interference with an ability to grieve claims. But such actions do not rise to the level of a constitutional violation. As the Fourth Circuit has explained, "inmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Booker v.*

*S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017); *see also Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) ("The Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state."). Thus, the only non-repetitive claim in his third "cause of action" must be dismissed.[14]

## D. Doe Defendants

There are two remaining defendants, both of whom Ross named only as Doe defendants. They are the individuals who allegedly were involved in testing Justin Hampton or in submitting test swabs for him when he says he was not tested. (*See* Am. Compl. ¶¶ 31, 106.) The court has permitted Ross discovery about their identities, and he only recently identified the two individuals that he believes are those two Doe defendants. (Dkt. No. 81.) The court will direct that the Clerk substitute, in place of the Doe #1 and Doe #2 respectively, individuals named Jody Meinster and Meisha McPherson.

Although the court will allow these two individuals to be added, the court must dismiss the claims against them for failure to state a claim. As discussed above, neither of those defendants took any action against Ross or did anything that constituted a violation of Ross's constitutional rights. Aside from labeling their acts "intentional," Ross present nothing to suggest that any errors were anything other than negligence, which cannot support a constitutional claim. Individuals do not have a constitutional right (1) to be free from a government employee's negligence, even if it causes an injury, or (2) to have the government protect them from such an injury. *Daniels v. Williams,* 474 U.S. 327, 335–36 (1986). Ross's amended complaint also fails to specify any way in which these allegedly false results caused any direct harm to him. It is simply too attenuated to say that a failure to test Hampton, even if

---

[14] Such allegations would be relevant if defendants were arguing that Ross's claims should be dismissed because he failed to exhaust his administrative remedies. But they have made no such argument in their motions.

he was on Ross's unit, caused harm or a substantial risk of potential harm to Ross.  An appropriate order dismissing these defendants will be entered.

### III.  CONCLUSION

For the foregoing reasons, the court will grant both motions to dismiss.  It will allow substitution of two new defendants for the Doe defendants, but it will dismiss claims against them pursuant to 28 U.S.C. § 1915A(b)(1).  These rulings result in the dismissal of Ross's amended complaint in its entirety.  An appropriate order will be entered.

Entered: March 14, 2022.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge